**Reversed and Remanded and Opinion Filed February 4, 2014**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-12-00544-CR

**JUVENCIO SAMUEL CARILLO, Appellant**

V.

**THE STATE OF TEXAS, Appellee**

On Appeal from Criminal District Court No. 2
Dallas County, Texas
Trial Court Cause No. F10-19275-I

## MEMORANDUM OPINION
Before Justices Bridges, FitzGerald, and Myers
Opinion by Justice Bridges

Juvencio Samuel Carillo appeals his conviction for possession with intent to deliver more than 400 grams of cocaine. After the jury found him guilty, the trial court assessed punishment at fifteen years in prison and a $500 fine. In two issues, appellant claims the trial court erred by overruling his motion to suppress and he received ineffective assistance of counsel at trial. We reverse and remand for further proceedings.

In March 2010, Victor Rodriguez of the Dallas County Sheriff's Department Intelligence Unit, got a tip about a mobile home that was involved in "narcotics transactions." On March 9, units from the High Intensive Drug Trafficking Area group began surveillance of the mobile home. A black pickup driven by appellant stopped at the house for ten to fifteen minutes, then left. Officers in unmarked cars began following the pickup. After thirty minutes, Rodriguez

believed appellant had either figured out he was being followed or was going to conduct a narcotics transaction because appellant started making "heat runs," described as driving to "different locations . . making u-turns, started going into businesses. There's no stopping. . . the heat runs is to kind of lose" whoever is following the driver. Rodriguez asked for a marked sheriff's car to follow appellant, spot a transportation code violation, and pull him over.

Deputy Omaro Calderon and his partner Kenneth Hurd of the Dallas Sheriff's Department followed appellant for ten to fifteen minutes before seeing the back wheels of the pickup cross a double white line. They then pulled appellant over. Appellant, who was calm and cooperative, answered Calderon's questions and provided his license. After everything, including a warrant check, came back clear, Calderon asked if they could search the pickup. When appellant refused to consent, the K9 unit was called.

Deputy Terry Trout is the dog handler for the Dallas County Sheriff's Office. He and his dog, Duke, were called around 1 or 1:30 p.m. Although unable to give exact times, Trout estimated it took him "a little over 45 minutes, maybe 50, 55 minutes" to get there. When they arrived, Duke got out, approached the pickup, and alerted on the back right passenger door. Trout opened the back door, and Duke immediately alerted on a partially opened tool bag. Trout removed the bag and found a black brick-like bundle that he cut open and tested for narcotics. The field test showed the substance was cocaine.

Appellant was arrested and charged with possession with intent to deliver more than 400 grams of cocaine. He filed a motion to suppress, claiming the drug evidence was the result of a warrantless search made without his consent and without probable cause. The motion was carried to trial. After the State rested, appellant asked for a ruling on the motion. Appellant argued the traffic stop was pretextual, and because there was no reasonable suspicion to detain

2

him further, the detention was unreasonable, particularly in light of the one-hour wait for the K9 unit to arrive. In response, the State argued the traffic stop was valid and

> once the detention is extended beyond that initial traffic stop, there does have to be reasonable suspicion that that car contains narcotics in order to continue the detention. And we believe that we have shown there was reasonable suspicion after that point to continue to detain the vehicle in that the detention, based on the circumstances, was reasonable.

The trial court found the initial detention was valid and, stating that "the critical thing, right or wrong, is that the defendant did not give consent to search [and] that allowed the officers then to seek a dog sniff," denied the motion. The trial court also held the length of time was not unreasonable under the circumstances. The jury found appellant guilty, and this appeal followed.

In his first issue, appellant claims the trial court erred by denying his motion to suppress. Under this issue, appellant contends the drug evidence should have been excluded because the initial stop and detention were pretextual and, even assuming they were not, the officers who stopped appellant had no specific articulable facts to justify a prolonged detention that resulted in a warrantless search of his truck. We agree.

When reviewing a trial court's ruling on a motion to suppress, we view all the evidence in the light most favorable to the ruling. *State v. Garcia–Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008). We apply a bifurcated standard of review, giving almost total deference to the trial court's findings of historical fact and reviewing de novo the trial court's application of the law of search and seizure. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). When, as here, the trial court does not make explicit findings of historical facts, we review the evidence in the light most favorable to the trial court's ruling. *Carmouche*, 10 S.W.3d at 327.

To suppress evidence on an alleged Fourth Amendment violation, the defendant bears the initial burden of producing evidence rebutting the presumption of proper police conduct which,

3

as in this case, he may do by establishing the search or seizure occurred without a warrant. *Bishop v.* State, 85 S.W.3d 819, 822 (Tex. Crim. App. 2002). Once the defendant makes this showing, the burden of proof shifts to the State to establish the search or seizure was reasonable. *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005).

An officer may stop and detain a person for a traffic violation. *Garcia v. State*, 827 S.W.2d 937, 944 (Tex. Crim. App. 1992). Routine traffic stops are analogous to investigative detentions and invoke a "*Terry* stop" analysis. *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984). Under a *Terry* stop analysis, we first decide whether the officer's action was justified at the inception. *State v. Duran*, 396 S.W.3d 563, 569 (Tex. Crim. App. 2013).

Here, Calderon testified that, when appellant's pickup exited I-30, it crossed the double white lines while moving into the right lane of traffic. Because this is a violation of the Texas Transportation Code, Calderon and his partner activated the patrol lights and pulled appellant over. The purpose of the stop, therefore, was to investigate the traffic violation and issue either a warning or citation. We overrule appellant's first issue to the extent he complains the purpose of the traffic stop was invalid.

The second prong under a *Terry* analysis is whether the search and seizure was reasonably related to the circumstances that justified the stop in the first place. *Kothe v. State*, 152 S.W.3d 54, 63 (Tex. Crim. App. 2004). In other words, the investigative stop may last no longer than necessary to effectuate its purpose. *Id*.; *see United States v. Brigham*, 382 F.3d 500, 512 (5th Cir. 2004) (en banc). Once the "computer check is completed, and the officer knows that this driver has a currently valid license, no outstanding warrants, and the car is not stolen," the traffic-stop investigation has been fully resolved, the detention must end, and the driver must be permitted to leave. *Kothe*, 152 S.W.3d at 63. Continued detention is justified only if the

officer has developed reasonable suspicion that the detainee is or will be engaged in other criminal activity. *Davis v. State*, 947 S.W.2d 240, 243–33 (Tex. Crim. App. 1997); *McQuarters v. State*, 58 S.W.3d 250, 256 (Tex. App.—Fort Worth 2001, pet. ref'd). To establish reasonable suspicion, an officer must be able to articulate something more than an inchoate and unparticularized suspicion or hunch. *Davis*, 947 S.W.2d at 245 (citing *U.S. v. Sokolow*, 490 U.S. 1, 7 (1989)). The determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior. *Id.* (citing *Illinois v. Wardlow*, 528 U.S. 119 (2000)). Police may not, however, unnecessarily detain drivers in the hopes of uncovering evidence of some other crime. *United States v. Sharpe*, 470 U.S. 675, 685—86 (1985).

During the investigation, Calderon clearly had the right to request a driver's license, insurance papers, information on the ownership of the vehicle, appellant's destination, and the purpose of the trip. *See Mohmed v. State*, 977 S.W.2d 624, 628 (Tex. App.—Fort Worth 1998, pet. ref'd). Because this was a routine traffic stop, Calderon was also authorized to run a license and warrants check. *Kothe*, 152 S.W.3d at 63 (stating officer may request certain information from driver, including driver's license and car registration and may conduct computer check of that information). Once the license and warrants check came back clear, the stop was over and appellant should have been issued a warning or citation and allowed to leave unless police had developed reasonable suspicion he was engaged in further criminal activity. Thus, we turn to the record to determine whether there is evidence to support the State's assertion and the trial court's implicit ruling that further detention was warranted.

A law enforcement officer conducts a lawful temporary detention when he has a reasonable suspicion to believe the individual is violating the law. *Ford*, 158 S.W.3d at 492. Reasonable suspicion exists if an officer has specific, articulable facts that, when combined with

rational inferences from those facts, would lead the officer to conclude reasonably that a particular person actually is, has been, or soon will be engaged in criminal activity. *Castro v. State*, 227 S.W.3d 737, 741 (Tex. Crim. App. 2007). In making a reasonable suspicion determination, we disregard the subjective intent of the officer making the stop and consider solely, under the totality of the circumstances, whether there was an objective basis for the stop. *See Ford*, 158 S.W.3d at 492–93. A party's refusal to consent to a search does not, without more, constitute reasonable suspicion. *See Florida v. Bostick*, 501 U.S. 429, 437 (1991); *Simpson v. State*, 29 S.W.3d 324, 328 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd).

Calderon testified he and Hurd were called to follow appellant and began doing so when appellant was traveling north on I-635 at or below the posted speed limit. They followed appellant for ten to fifteen minutes. Calderon said he was watching for any traffic violation although he knew this was a "drug stop." Appellant periodically switched lanes, but each time, he did so after properly signaling. The truck exited onto I-30 headed east, then turned off the freeway at the Beltline-Broadway exit. While exiting, the truck's back tires crossed the double white line. Upon seeing the traffic violation, the officers activated their patrol lights and followed the truck to the parking lot of a nearby pawn shop. Appellant and another Hispanic male exited the truck and began walking to the pawn shop when the officers called the men over. Calderon described both men as very calm and cooperative, not anxious or nervous. Calderon asked appellant what they were doing, and appellant said he was a musician or a DJ, looking to buy some speakers. Calderon verified appellant's insurance and checked his driver's license. After he confirmed there were no outstanding warrants, Calderon asked if they could search the truck. Appellant refused to consent. According to Calderon, that "pretty much end[ed his] part of the stop." Calderon said he did not look inside the truck. Nothing in Calderon's testimony

indicates a reasonable suspicion justifying a further detention or warrantless search. In fact, Calderon's testimony indicates no criminal or unusual activity that would warrant a person of reasonable caution to believe another offense had been or was being committed. *See Davis*, 947 S.W.2d at 243.

Rodriguez testified he got a tip from an Immigration and Customs Enforcement agent who said if Rodriguez "ha[d] some time, you know, go out. And this is the location you might want to look at because it's involved in narcotics transactions." The address was a trailer park and Rodriguez "was given a specific location." A few days later, approximately seven to eight unmarked units began surveillance of the mobile home; Rodriguez[1] was in one of the units. Initially, it appeared no one was at the house. After about ninety minutes, a black pickup arrived at the mobile home; appellant was driving and had one passenger. The two men got out and went inside the mobile home.

After ten to fifteen minutes, the two men got in the pickup and left. Although they did not see either man carry anything out or place anything in the pickup, Rodriguez and his surveillance team began following the men. Rodriguez estimated there were between six to eight unmarked vehicles following the men. The men drove for about thirty minutes before the pickup exited the roadway and entered a shopping area. According to Rodriguez, the individuals in the pickup started making a "heat run," designed to lose anyone who might be following them. The driver took the exit, which was normal, but then

> started getting into like shopping centers, making u-turns, going into stores, stopping, going around and not stopping to either go eat or to go into a store to purchase anything. It was different stops sporadically. The vehicle was going everywhere.

---

[1] Rodriguez testified he could not recall who owned the mobile home. The record indicates that, upon execution of a search warrant at the mobile home, no drugs were found.

According to Rodriguez, this went on for about ten to fifteen minutes before the pickup was pulled over by Calderon and Hurd. When asked, Rodriguez said he could not recall if the pickup slowed down or pulled into a parking space while driving in the parking lots.

Rodriguez watched the traffic stop from a nearby parking lot. When appellant refused to give consent to search the pickup, Rodriguez was notified and the K-9 unit was called. Rodriguez said the men were being detained at that point and were not free to leave; they were not, however, under arrest. When asked specifically whether the K9 unit was called before or after appellant was pulled over for the traffic violation, Rodriguez responded that they generally call the unit when they see a vehicle making a "heat run."

During cross-examination, Rodriguez testified he had no idea where the ICE agent got the tip on the mobile home and could not remember when the agent passed it on to him. He did not write down the address the agent gave him and could not recall it. He did not write a report, although he did review another officer's report before testifying. He conceded that report did not mention "heat runs" or the undercover surveillance of the mobile home and that neither he nor any of the officers there saw appellant or his passenger carry the drugs from the mobile home to the pickup or otherwise handle the drugs. Rodriguez's testimony shows appellant stopped at a mobile home that, according to a "tip" from an ICE agent, was involved in narcotics, was not seen carrying anything in or out of the home, and was followed for 45 minutes, during which time he pulled into a shopping center and drove around, pulling in and out of locations.

When the officers decided to detain appellant and the vehicle following the traffic stop, they knew the vehicle was not reported stolen, the insurance papers were in proper order, and appellant had a valid license but no outstanding warrants. Appellant's continued detention for almost an hour, which the State conceded during oral argument to be a "prolonged detention,"

8

appears to have been based on Rodriguez's testimony that appellant stopped at a mobile home which was allegedly involved in narcotics, was not seen carrying anything in or out of the home, and after being followed for thirty minutes by numerous unmarked surveillance cars, pulled into a shopping center and drove around, pulling in and out of locations, as well as the trial court's conclusion that appellant's refusal to consent to a search gave the officers the reasonable suspicion needed to further detain him. A refusal to consent, however, cannot alone establish reasonable suspicion. *See Bostick*, 501 U.S.at 437; *Simpson*, 29 S.W.3d at 328. And, after viewing all the evidence in the record, we conclude Rodriguez's statements, no more than inchoate and unparticularized hunches, are insufficient to constitute reasonable suspicion justifying a prolonged detention. *See Simpson*, 29 S.W.3d at 328.

Under these facts and circumstances, we conclude the State failed to establish the officers had reasonable suspicion justifying appellant's continued detention once the traffic stop had concluded. The trial court erred by denying appellant's motion to suppress and admitting the evidence at trial.

Because a search that offends the Fourth Amendment renders the subsequently discovered evidence inadmissible as "fruit of the poisonous tree," the error is constitutional, and we must reverse the judgment unless we determine beyond a reasonable doubt apply that the error did not contribute to appellant's conviction. *See Jones v. State*, 119 S.W.3d 766, 777 (Tex. Crim. App. 2003); *McQuarters*, 58 S.W.3d at 258. In this case, there was no confession, no one testified about selling the cocaine to appellant, and no one saw appellant with the cocaine. Because the drug evidence found in appellant's truck was the only evidence at trial establishing appellant possessed cocaine, we conclude there is a reasonable likelihood the error contributed directly to appellant's conviction. We sustain appellant's first issue to the extent it challenges his

prolonged detention and the denial of his motion to suppress.  We find it unnecessary to address his second issue.  *See* TEX. R. APP. P. 47.1.

We reverse the trial court's judgment and remand this case for further proceedings.

/David L. Bridges/
DAVID L. BRIDGES
JUSTICE

Do Not Publish
TEX. R. APP. P. 47

120544F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

JUVENCIO SAMUEL CARILLO,
Appellant

No. 05-12-00544-CR       V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court
No. 2, Dallas County, Texas
Trial Court Cause No. F10-19275-I.
Opinion delivered by Justice Bridges.
Justices FitzGerald and Myers participating.

Based on the Court's opinion of this date, the judgment of the trial court is **REVERSED** and the cause **REMANDED** for further proceedings consistent with this opinion.

Judgment entered February 4, 2014

/David L. Bridges/
DAVID L. BRIDGES
JUSTICE